Shauck, J.,
dissenting. Much need .not be added to what has already been said in the present case. I am entirely content with the opinion of the Chief Justice as demonstrating that the act in question is repugnant to the section of the constitution which prescribes the qualifications of electors; and there is much in the opinion written to support the judgment announced from which there appears to be no reason for dissent. I quite concur in that portion of it which declares the *63 high duty of this court to sustain the organic law against all legislation in conflict with it, and believe that the scope of that duty might be more broadly stated without violence to the views of those who have been attentive to the functions of written constitutions in governments like ours. Upon this point my dissent is from the judgment. We cannot regard ourselves as sustaining the paramount law if we adjudge the validity of a statute in conflict with it, whatever may be said in our opinions. Nor do I dissent from the proposition that acts should not be adjudged to be void upon mere doubt, slight implication or vague conjecture. This, however, is a rule for resolving doubts, not for raising them. In so far as doubts depend upon the subjective condition of the doubter, or his attitude toward duty, they cannot be profitably or even decorously discussed. One who rejoices in the performance of every clearly ascertained duty, will often find himself in disagreement with one who regards some duties of that character as unpleasant. I further desire to express my hearty concurrence in all that is said in the principal opinion to extol the benefits of education.
But the force of inferences drawn from a comparison of this with other statutes is not apparent. Some of those statutes are so obviously different that they distinguish themselves. Respecting one of them — that to authorize the late constitutional convention — that cannot be said; at least no difference is readily apparent to me. But the validity of that act was not challenged, and it is convenient *64 to refute the inference which the majority draws from it by quoting the words of Judge Cooley: “Acquiescence for no length of time can legalize a clear usurpation of powers, where the people have plainly expressed their will in the constitution, and appointed judicial tribunals to enforce it. A power is frequently yielded to merely because it is claimed, and it may be exercised for a long period, in violation of the constitutional prohibition, without the mischief which the constitution was designed to guard against appearing, or without any one being sufficiently interested in the subject to raise the question; but these circumstances cannot be allowed to sanction a clear infraction of the constitution.” Constitutional Limitations (7 ed.), 106. Nor can the conclusion announced derive support from an anticipation of the time fixed by the people when, in case of an alleged conflict between their will as expressed in the organic law and the will of their servants as expressed in an act of the legislature, the concurrence of at least two-thirds of this court will be required to sustain what we now call the paramount law. A little later, respect for the meaning of words may require us to change our legal nomenclature; but the constitution is yet the paramount law.
The attempt to make the act to appear to be a permissible classification of the officers of the state for the purpose of their election fails for reasons which are very obvious. It is said that the duties of judges are confined to the determination of rights under the law, and that they have *65 nothing to do with policies. This statement is quite remarkable since the courts of the states and nation, since their organization, in determining the validity of contracts, have covered the entire field of public policy, except the limited portions thereof, which are covered by valid statutes. On the other hand, we look in vain for any duty to be discharged by the executive and administrative officers of the state, except to execute and administer the laws as they are made. But even if there were the suggested differences in their functions, all are officers of the state, most of them filling stations created by the constitution and exercising powers which reside in the people and which are delegated because the people themselves are unable to perform them, and all are required alike to be chosen by popular election, and it is idle to say that a difference in the manner of their election was contemplated. It seems, therefore, that the reasons assigned for the conclusion that this is permissible classification are unsound. If they were sound thejr would still be manifestly inadequate, for it is conceded that there can be no classification among judicial officers. There will perhaps not be required a citation of authority to support the proposition that all statutes in pari materia should be construed together. An essential part of the legislation on this subject is the act of May 10, 1911 (102- O. L., 155), creating the municipal court of the city of Cleveland, and providing for the nomination of its judges. This act was passed by the same general assembly which enacted the statute providing for the sepa *66 rate ballot. In the Sth section of the act there are provisions which without exception, require that all of the candidates for judge of that court shall be nominated by parties, either at a primary election or by delegate conventions, as the controlling committee of the party may determine. There is thus created for that city an exception to the general section authorizing nominations by petition, and the requirement that the judicial officers named must be nominated by parties makes it clear that only the names of those who have been nominated by political parties for those offices can be placed upon the judicial ballot, and the legislature has thus provided a classification by which the choice of judicial officers is made subject to one rule in one part of the state and by a different rule in the remaining part; and the classification proceeds upon the assumption that the voters of Cleveland know so little respecting the character and ability of their neighbors living within the limits of the same city that it is imperative that they shall have the guidance of party nominations, while in entire counties, in judicial subdivisions, in the circuits, and even in the entire state, they are so familiar with the characters and abilities of those from whom the judges are to be chosen that they must be denied such guidance. May we not conclude, without proceeding upon mere suspicion or vague conjecture, that this classification is arbitrary, and, therefore, not permissible? It seems clear to me that the opinion of the majority fails to sustain *67 the act at the points upon which its validity has been challenged.
A few observations upon a point not noticed in that opinion are due to a full consideration of the case. If it is assumed that every act of the legislature is valid unless it transcends some limitation expressed in the constitution, or clearly to be inferred from what is there expressed, the assumption is wholly without warrant. Those who have seriously studied constitutions as instruments locating the powers of government and defining the modes of their exercise, concur in the view that limitations operate only upon powers conferred. Powers not conferred cannot be exercised to any extent or in any manner. The functions of the state are governmental only, and there is vested in the general assembly the legislative power of such a government as was formed, and nothing more. Confessedly, the government formed consists of three equal coordinate departments. None of them is subordinate. Care having been taken to form a government of departments thus related, every construction should be consistent with that purpose and with the intention that the relation thus established should continue. In view of that purpose will it be considerately said that the grant of legislative power carried with it authority to weaken the coordinate judicial department, either by providing special opportunities for weakening the character or abilities of those who exercise its functions, or by destroying the public confidence in it by making it representative *68 of only' small minorities ? If the legislative power conferred was less than that which, nearly contemporaneously, was exercised by the French Assembly to the horror of mankind, the power must be defined by a consideration of the character of the government formed independently of limitations imposed upon the exercise of the power which is' conferred.
■ It is appropriate here to consider another reason for denying that the power to pass an act of the character of this was included in the general grant of legislative power. At the timé of the adoption of the constitution there was, as in representative governments there always had been, universal comprehension that political parties are inseparable from such governments. As thoughtful men would conjecture, and as all experience had shown, men admitted to participation in the exercise of the powers and duties of governing arranged themselves in groups, or parties, for the purpose of effectively advancing policies and of choosing those who should represent them in the exercise of the powers of government. For purposes which required the concurrence of majorities no other mode or procedure was known or séemed practicable. No other that is practicable now seems to be known. If there were in the constitution no limitation upon the exercise of powers conferred, would it be rational to so define the grant of legislative power in the governméiit thus established as to make the servant greater than his lord, and to' authorize the legislature to restrict, or impede, the people in the *69 exercise of their right to participate in the government in the only known mode in which they could participate, and in the choice of the officers who should represent them in the discharge of its functions? One not engaged in teaching the elements of constitutional law need not enlarge upon the importance to a people, jealous of personal liberty, of rights which they did not surrender because they were not necessary to competent and stable government.
Whatever may have been the motives which prompted to the enactment in question, however diverse they may have been, it is entitled “An act to provide for the election of judicial officers by separate ballot.” However sinister or commendable those motives may have been, they are. conjectural and immaterial. The purposes and effect of the act may be gathered from its provisions. An obvious purpose was to withhold from the voter the aid of his party in the choice of important officers to be made from those of whose fitness he could at most have but accidental and limited knowledge. Purposes only a little less obvious were to make hopeful the candidacy of men who could not secure the nomination of any party desiring to secure the confidence of intelligent and considerate voters, and to make easy the election of judicial officers by small minorities of the voters banded for purposes which may not comprehend the general good. The purpose first stated won some favor by the insinuation that judges nominated and elected as candidates of political parties had been subservient to their par *70 ties. However deep may be the resentment which the insinuation starts, it need not be repelled in violent language. Nothing more is necessary than to refer to the roll which bears the honored names of my predecessors and associates, who, though chosen by all the parties which have risen to influence in the state, have, for more than a century, avoided occasion for such reproach. Indeed, parties organized to endure are too wise to demand such subserviency from judicial officers. If, in an instance in our history, a great political party so far forgot its high duty as one of the recognized conservators of our institutions as to demand that this court, then composed wholly of men selected by that party, commit an act of nullification by denying the authority of the supreme court of the United States on a federal question, Ex parte Bushnell, 9 Ohio St., 77, was the court’s noble and dignified defiance.
Although since the judgment in this case was' announced, an election of judges of the various courts of the state has been held the tendency and effect of the act are scarcely better, though they may be much more generally known, than when the announcement was made. By these and not by the title or language of the act its validity should be determined. If authority for that elementary proposition is needed, it may be found in the approved text-books, and in many cases including State v. Hipp, 38 Ohio St., 199. If in the adjudication of cases of the character of this we ignore the clear effect of legislation we shall render but lip service to the constitution. We *71 have seen as results of that judgment, not only the imperative disfranchisement of all constitutionally qualified electors who cannot read, but the most intelligent voters driven to annoying, and sometimes vain, search for information respecting the character and ability of candidates whose names they could read. Many of the latter class of electors, finding that the source of information upon which they were accustomed to rely had been arbitrarily closed, and finding no other means of obtaining information practicable, accepted their lot as equivalent to disfranchisement. Although both of the regular political parties had made nominations for three positions in this court, each of them naming reputable candidates, the places have been filled by small minorities of the electors, no candidate receiving, according to present returns, as much as one-fifth of the number of votes which were cast at the same election for officers whose election was untrammeled.
That part of the responsibility for this condition which the general assembly assumed by passing this act is apparent. It would be unjust, if it were practicable, to shift to that department the responsibility which belongs to this. All the reasons for adjudging this act to be void, which are here presented, and those which are presented in the opinion of the chief justice, with others, were, before the judgment was announced, presented to the majority for such consideration as they chose to give them.